GIBSON & ASSOCIATES, INC., PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 5863–08.        Filed February 24, 2011.

P is an engineering and heavy construction company that
primarily erects or rehabilitates streets, bridges, airport run-
ways, and other related real property (collectively, real prop-
erty). P's rehabilitation services relate mainly to real property
that is substantially dilapidated or damaged from a casualty.
P also repairs and maintains real property. P reported on its
Federal income tax return for the taxable year ended June 30,
2006, that its receipts are "domestic production gross receipts"
(DPGR) eligible for a deduction under sec. 199, I.R.C., and
claimed a $63,435 deduction under that section. R determined
in the notice of deficiency that none of P's receipts qualified
as DPGR. *Held*: P's receipts are DPGR to the extent P erected
or substantially renovated real property, and the extent to
which P substantially renovated real property turns on
whether P's activities with respect to each freestanding item
of real property that operated and performed a discrete func-
tion in and of itself: (1) Materially increased the value of the
real property, (2) substantially prolonged the useful life of the
real property, and/or (3) adapted the real property to a dif-
ferent or new use. *Held*, *further*, P's activities materially
increased the value of the real property, substantially pro-
longed the useful life of the real property, and/or adapted the
real property to a different or new use to the extent that P's
activities were not repairs (within the meaning of sec. 263(a),
I.R.C.), unrelated to P's primary business. *Held*, *further*, P's
activities did not materially increase the value of the real
property, substantially prolong the useful life of the real prop-
erty, and/or adapt the real property to a different or new use
to the extent that P's activities repaired or otherwise main-
tained real property unrelated to P's primary business.

195

*Charles D. Lieser*, for petitioner.
*George E. Gasper*, for respondent.

PARIS, *Judge*: Petitioner petitioned the Court to redetermine respondent's determination of a $21,568 deficiency in its Federal income tax for its taxable year ended June 30, 2006 (subject year). The deficiency results from respondent's determination that petitioner may not deduct $63,435 under section 199(a).[1] Respondent disallowed that deduction after determining that petitioner had no "domestic production gross receipts" (DPGR) within the meaning of section 199(c)(4). Petitioner reported that its DPGR totaled $26,053,570.[2]

Respondent now concedes that petitioner had DPGR of $13,849,246, and petitioner concedes that it incorrectly reported $259,156 of the $26,053,570 as DPGR.[3] We decide whether the remaining $11,945,168 ($26,053,570 – $13,849,246 – $259,156) (disputed amount) is DPGR. We hold it is to the extent stated herein.

FINDINGS OF FACT

Some facts were stipulated. The stipulation of facts and the exhibits submitted therewith are incorporated herein by this reference. Petitioner is a family-owned corporation that reports its income and expenses on the basis of a fiscal year ending on June 30. Its principal place of business was in Texas when its petition was filed.

Petitioner is an engineering and heavy highway construction company that primarily erects or rehabilitates streets, bridges, airport runways, and other major components or substantial structural parts of real property (primarily, infrastructure) in Texas, Oklahoma, Arkansas, and Kansas. Peti-

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code of 1986 (Code), as amended, and Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded.

[2] As relevant here and discussed *infra*, the deduction under sec. 199(a) equals 3 percent of the lesser of a taxpayer's qualified production activities income (QPAI) or the taxpayer's taxable income (as computed without the deduction under sec. 199(a)), and a taxpayer's QPAI equals the taxpayer's DPGR less the sum of its cost of goods sold (allocable to the DPGR) plus certain expenses and other items. Petitioner's reported deduction of $63,435 equals 3 percent of its reported taxable income (as computed without the deduction).

[3] Petitioner reported that its DPGR totaled $26,053,570 but now asks the Court to find that its DPGR totaled $25,794,414 (i.e., $259,156 less than reported). Petitioner concedes explicitly that $98,455 of the $259,156 is not DPGR, and we consider petitioner also to concede that the remaining $160,701 ($259,156 – $98,455) is not DPGR as well.

tioner specializes in structural rehabilitation, epoxy injection, concrete paving, bridge jacking, lead abatement, and protective coatings. Petitioner also maintains and repairs infrastructure and other real property.

Petitioner works through its employees. During the subject year, petitioner employed approximately 90 individuals. These employees were mainly engineers or heavy construction workers, and petitioner paid them over $3 million in salary and wages. Petitioner hired and retained additional employees in subsequent years.

Petitioner worked on 136 construction projects during the subject year. Petitioner realized $25,892,869 of gross receipts from these projects, including $16,324,032 of gross receipts from State or Federal projects paid for with Federal funds.[4] Petitioner reported the $25,794,414 (and the now conceded $259,156) as DPGR and claimed a $63,435 deduction under section 199.[5] Respondent determined that petitioner could not deduct the $63,435 because petitioner had no DPGR.

Petitioner placed its construction projects into three categories. The first category, "casualty" projects, involved work that petitioner performed on infrastructure that was significantly damaged by an act of God or by a casualty such as a fire or an overheight or overweight vehicle hitting or traveling on a bridge. The second category, "new construction" projects, involved work that petitioner performed primarily as a subcontractor on contractors' multimillion dollar projects involving major rehabilitation of real property (primarily, infrastructure). The third category, "rehabilitation" projects, involved work that petitioner performed as a contractor rehabilitating dilapidated real property (primarily, infrastructure). Petitioner classified its projects into these three categories after reviewing the bid sheets and the other data in its files and after talking to individuals involved with the projects. Petitioner's bid sheets were papers that petitioner prepared to calculate and place a bid on a project offered to contractors (or subcontractors). Each bid sheet contained an

---

[4] A project may be paid for with Federal funds if the Secretary of Transportation concludes that the project is a cost-effective means of extending the useful life of a Federal-aid highway. See 23 U.S.C. sec. 116 (2006); see also *id.* sec. 101(a)(31) (defining the word "Secretary" for purposes of tit. 23 as the "Secretary of Transportation").

[5] Petitioner used the percentage of completion method under sec. 460 to compute its taxable income.

estimate of the amounts and types of costs that petitioner expected to incur in performing the project.

Petitioner further characterized its projects as: (1) Substantial renovation or (2) repair or maintenance. Petitioner characterized a project as substantial renovation if petitioner concluded that its work on the project: (1) Substantially prolonged the useful life of real property; (2) materially increased the value of real property; or (3) adapted real property to a new or different use. Petitioner categorized its construction projects as repair or maintenance if petitioner concluded that its work on the project: (1) Was necessary to keep real property (or a component thereof) functioning on a short-term basis or (2) included cosmetic or aesthetic work.

Appendixes A, B, and C list petitioner's projects (other than 32 projects which are the subject of the parties' concessions discussed *supra* p. 196) as categorized by petitioner. The appendixes show for each of those 104 remaining projects (disputed projects): (1) The job number, (2) the general type of work that petitioner performed, (3) the final contract amount, (4) the revenue that petitioner earned for the subject year, (5) whether the project was paid for with Federal funds, and (6) petitioner's characterization of the project as repair or maintenance, substantially prolonging the useful life of real property, materially increasing the value of real property, and/or adapting real property to a different or new use. The specific work that petitioner performed on each project is as follows:

### Casualty Projects

#### 05–1021

Petitioner performed this project for the Texas Department of Transportation (TxDOT). Petitioner strengthened a bridge at Highway 123 and McArthur Boulevard. The bridge had been critically damaged by a fire caused by an overturned fuel truck, and most of the bridge was closed. Petitioner strengthened the columns and spans of the bridge using carbon fiber reinforced polymer and structural patching. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1023

Petitioner performed this project for the North Texas Tollway Authority (NTTA). Petitioner shored up an overhead emergency sign structure on the North Texas Tollway after the sign was damaged. Petitioner's work allowed the NTTA to keep the sign in place. The sign would have been demolished absent petitioner's work. Petitioner concluded that this work substantially prolonged the useful life of the sign.

### 05–1025

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge near Pampa, Texas, on U.S. Highway 83. The work rehabilitated damaged concrete beams so that the bridge could reopen to traffic and carry its design loads. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1029

Petitioner performed this project for the Oklahoma Department of Transportation (ODOT). Petitioner worked on a bridge in Oklahoma County, Oklahoma, on Interstate Highway 40 over Anderson Road. The work rehabilitated damaged concrete beams so that the bridge could reopen to traffic and carry its design loads. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1045

Petitioner performed this project for the ODOT. Petitioner worked on a steel bridge on U.S. Highway 64 and 129 West Avenue between Tulsa and Sand Springs, Oklahoma. The work rehabilitated damaged concrete beams so that the bridge could reopen to traffic and carry its design loads. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1054

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge near McKinney, Texas, in Farmersville, Texas, on U.S. Highway 380 and Main Street. The work rehabilitated and/or replaced damaged concrete beams so

that the bridge could reopen to traffic and carry its design loads. Petitioner also performed some concrete work. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1056

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on Farm-to-Market 157 over Interstate Highway 30 in Tarrant County, Texas. The work rehabilitated damaged concrete beams so that the bridge could reopen to traffic and carry its design loads. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1059

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on Interstate Highway 37 and U.S. Highway 181 in Corpus Christi, Texas. The work rehabilitated damaged concrete beams so that the bridge could reopen to traffic and carry its design loads. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1060

Petitioner performed this project for the NTTA. Petitioner worked on a highway. Petitioner's work consisted of "PGBT fire damage". Petitioner concluded that this work was repair or maintenance.

### 05–1064

Petitioner performed this project for the ODOT. Petitioner worked on a bridge on Interstate Highway 40 at Choctaw Road. The work rehabilitated damaged concrete beams so that the bridge could reopen to traffic and carry its design loads. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1065

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on Interstate Highway 35 at Corinth Street. The work rehabilitated damaged concrete beams so

that the bridge could reopen to traffic and carry its design loads. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–999

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at Randall Avenue and Interstate Highway 40 in Oklahoma. Petitioner sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner also removed existing lead paint (a perceived hazardous material), blasted the bridge to remove corrosion, and applied a protective paint coating designed to prevent future corrosion. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 06–1072

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at County Road and Interstate Highway 40 in Custer County, Oklahoma. Petitioner replaced structural steel portions of the bridge to return the bridge to its original load carrying capacity. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 06–1073

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at Ladd Road and Interstate Highway 35 in McClain County, Oklahoma. Petitioner's work strengthened the bridge and returned the bridge to its original load carrying capacity. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 06–1074

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at Interstate Highway 244 and the 23d Street Ramp in Tulsa, Oklahoma. Petitioner strengthened the columns of the bridge to resist future impact damage from derailed train cars in a nearby railroad yard. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 06–1078

Petitioner performed this project for the ODOT. Petitioner worked on a bridge on State Highway 266 and U.S. Highway 169 in Tulsa County, Oklahoma. Petitioner rehabilitated damaged concrete beams so that the bridge could reopen to traffic and carry its design loads. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 06–1084

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on Interstate Highway 37 and Sundown Bridge in Texas. Petitioner rehabilitated damaged concrete beams so that the bridge could reopen to traffic and carry its design loads. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 06–1087

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on Interstate Highway 20 at Farm-to-Market 31 in Texas. Petitioner rehabilitated damaged concrete beams to restore the bridge's load carrying capacity. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 06–1091

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge at Interstate Highway 30 and Jim Miller Road in Texas. Petitioner rehabilitated damaged concrete beams so that the bridge could reopen to traffic and carry its design loads. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### New Construction Projects

### 03–906

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge at U.S. Highway 287 and the Trinity River in Texas. Petitioner raised the bridge to keep it out of the flood plain and reduce the chance that the bridge could close on account of high water or drifting debris. Petitioner

concluded that this work substantially prolonged the useful life of the bridge.

### 03–921

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge at U.S. Highways 80 and 175 in Texas. Petitioner's work consisted of patching the deck of the bridge. Petitioner concluded that this work substantially prolonged the useful life of the bridge driving surface.

### 03–926

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on Loop 335 in Texas. Petitioner applied an epoxy overlay designed to protect the bridge from the environment. Petitioner concluded that this work substantially prolonged the useful life of the bridge deck.

### 04–937

Petitioner performed this project for the City of Dallas, Texas. Petitioner worked on a blast fence at two locations at Love Field Airport in Dallas. The blast fence included catwalks and port holes and was built on an old apron to allow for maintenance run-ups and a staging area for hijacked aircraft. Petitioner concluded that this work materially increased the value of the property and adapted the property to a new or different use.

### 04–954

Petitioner performed this project for the TxDOT. Petitioner worked on some bridge joints on Loop 360 in Travis County, Texas. Petitioner rehabilitated pavement and joints. Petitioner concluded that this work substantially prolonged the useful life of the pavement.

### 04–955

Petitioner performed this project for the TxDOT. Petitioner worked on some bridge header joints in Williamson County, Texas. Petitioner rehabilitated pavement and joints. Petitioner concluded that this work substantially prolonged the useful life of the pavement.

### 04–956

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on Interstate 35 in Travis County, Texas. Petitioner's work involved structural steel, head joints, and bridge deck patches. Petitioner concluded that this work involving structural steel and head joints substantially prolonged the useful life of an HMAC overlay. Petitioner concluded that this work involving the bridge deck patches substantially prolonged the useful life of the bridge deck and the HMAC overlay.

### 04–959

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on Interstate 35E in Texas. Petitioner rehabilitated concrete pavement so that an asphalt overlay could be installed properly. Petitioner also rehabilitated joints on the bridge. Petitioner concluded that this work substantially prolonged the useful life of the pavement on the bridge.

### 04–965

Petitioner performed this project for the TxDOT. Petitioner worked on State Highway 205 in Texas. Petitioner added turn lanes and driveways and patched paving. Petitioner concluded that the added lanes and driveways adapted the highway to a different use. Petitioner concluded that its pavement work substantially prolonged the useful life of both the concrete pavement and the new HMAC overlay.

### 04–967

Petitioner performed this project for the TxDOT. Petitioner worked on Interstate Highway 35E in Dallas, Texas. Petitioner rehabilitated concrete pavement so that an asphalt overlay could be installed properly. Petitioner also rehabilitated joints on the bridge. Petitioner concluded that this work substantially prolonged the useful life of the pavement on the bridge.

### 04–968

Petitioner performed this project for Eastfield College in Texas. Petitioner rehabilitated a failed column at a building

at the college. Petitioner concluded that this work substantially increased the useful life of the building from zero to its original design life.

### 04–971

Petitioner performed this project for the Dallas/Fort Worth Airport Authority. Petitioner worked on a garage ramp at the airport. The ramp had deteriorated, and petitioner rebuilt the ramp to allow for traffic to exit the garage. Petitioner concluded that this work materially increased the value of the garage ramp and adapted the ramp to a new or different use.

### 04–981

Petitioner performed this project for the TxDOT. Petitioner worked on U.S. Highway 67 in Texas. Petitioner rehabilitated concrete pavement so that an asphalt overlay could be installed properly. Petitioner also rehabilitated joints on the bridge. Petitioner concluded that this work substantially prolonged the useful life of the pavement on the bridge.

### 04–982

Petitioner performed this project for the TxDOT. Petitioner worked on Interstate Highway 35E in Texas. Petitioner rehabilitated concrete pavement so that an asphalt overlay could be installed properly. Petitioner also rehabilitated joints on the bridge. Petitioner concluded that this work substantially prolonged the useful life of the pavement on the bridge.

### 05–1000

Petitioner performed this project for the Kansas Department of Transportation. Petitioner worked on a bridge on Interstate Highway 35 over 127th Street in Wichita, Kansas. Petitioner applied an epoxy overlay designed to protect the bridge from the environment. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 05–1002

Petitioner performed this project for the ODOT. Petitioner worked on a bridge on State Highway 88 over Dog Creek in Rogers County, Oklahoma. Petitioner installed a new traffic

rail that upgraded the crash-worthiness rating from the old rail. Petitioner replaced the bridge deck to allow for traffic and increase the bridge's load rating. Petitioner concluded that this work substantially prolonged the useful life of the bridge, materially increased its value, and adapted the bridge to a new or different use.

### 05–1003

Petitioner performed this project for the City of Dallas, Texas. Petitioner worked on the Marsalis Avenue Bridge over the Dallas Zoo. Petitioner repainted the deteriorating substructure, replaced a portion of the deck (including with a new pedestrian walkway), replaced a number of beams and girders, and applied corrosive painting after removing the old paint. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 05–1011

Petitioner performed this project for the Crescent Hotel in Dallas, Texas. Petitioner modified a handrail at the hotel and removed and replaced concrete to comply with the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. secs. 12101–12213 (2006). Petitioner concluded that this work adapted the property to a new or different use.

### 05–1018

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge at U.S. Highway 287 and Heritage Parkway in Texas. Petitioner rotated the bridge's bearing pads. Petitioner concluded that this work was repair or maintenance.

### 05–1019

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on U.S. Highway 79 in Panola County, Texas. Petitioner rehabilitated concrete pavement so that an asphalt overlay could be installed properly. Petitioner also rehabilitated joints on the bridge. Petitioner concluded that this work substantially prolonged the useful life of the pavement on the bridge.

### 05–1028

Petitioner performed this project for the ODOT. Petitioner worked on a steel bridge over Business Interstate Highway 40 in Beckham County, Oklahoma. The contractor renovated the bridge, and petitioner applied the protective coating. Petitioner also removed existing lead paint (a perceived hazardous material), blasted the bridge to remove corrosion, and applied a protective paint coating designed to prevent future corrosion. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1032

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on U.S. Highway 287 in Texas. Petitioner leveled the bearing pads. Petitioner concluded that this work was repair or maintenance.

### 05–1036

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on Interstate Highway 20 over the Brazos River in Texas. Petitioner adjusted the bearings of the bridge to prevent damage and rehabilitated cracks in a structural steel diaphragm to allow the bridge to carry the load for which it was originally designed. Petitioner also removed existing lead paint (a perceived hazardous material), blasted the bridge to remove corrosion, and applied a protective paint coating designed to prevent future corrosion. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1037

Petitioner performed this project for the ODOT. Petitioner worked on a bridge on U.S. Highway 270 over Caston Creek in Le Flore County, Oklahoma. Petitioner sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 05–1038

Petitioner performed this project for the TxDOT. Petitioner worked on the pavement on Interstate Highway 20 in Texas. Petitioner rehabilitated concrete pavement so that an asphalt overlay could be installed properly. Petitioner also rehabilitated joints on the bridge. Petitioner concluded that this work substantially prolonged the useful life of the pavement on the bridge.

### 05–1043

Petitioner performed this project for the TxDOT. Petitioner worked on the intersections at State Highway 356. Petitioner added left and right turn lanes to the intersections to improve traffic flow. Petitioner concluded that this work materially increased the value of the property and adapted it to a new or different use.

### 05–1047

Petitioner performed this project for the City of Fort Worth, Texas. Petitioner worked on the Hulen Street Bridge in Fort Worth. Petitioner sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 05–1052

Petitioner performed this project for the City of Dallas, Texas. Petitioner worked on the aprons at two terminals at the Love Field Airport in Dallas. Petitioner upgraded the ramps to the aprons for heavier aircraft, by removing approximately 12,000 square yards of approximately 50-year-old, 13-inch pavement and replacing it with 16-inch pavement. Petitioner also replaced the existing trench drains with new drains that met applicable Federal standards. Petitioner concluded that this work substantially prolonged the useful life of the property, materially increased its value, and adapted the property to a new or different use.

### 05–1057

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on U.S. Highway 83 in Texas. Petitioner

modified the bearings on the bridge to prevent damage and to maintain the bridge's load carrying capacity. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 05–995

Petitioner performed this project for the City of Oklahoma City, Oklahoma. Petitioner worked on a bridge at Walnut Avenue in Oklahoma City. Petitioner removed existing lead paint (a perceived hazardous material), blasted the bridge to remove corrosion, and applied a protective paint coating designed to prevent future corrosion. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 06–1069

Petitioner performed this project for the Lakes of Coppell housing subdivision in Coppell, Texas. Petitioner worked on a failing retaining wall that spanned the length of the waterways running through the subdivision. The wall had cracked and was falling into the water. Petitioner replaced the failing wall with a new retaining wall and improved the drainage behind the wall. Petitioner concluded that this work substantially prolonged the useful life of the subdivision and materially increased its value.

### 06–1071

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on U.S. Highway 290 in Texas. Petitioner installed new bridge joints to improve the life of the new overlay. Petitioner concluded that this work substantially prolonged the useful life of the property.

### 06–1085

Petitioner performed this project for the TxDOT. Petitioner worked on a culvert along State Highway 121 in Texas. Petitioner's work consisted of structural repairs and waterproofing. Petitioner concluded that this work was repair or maintenance.

### 06–1089

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on Interstate Highway 30 in Texas. Petitioner rehabilitated concrete pavement so that an asphalt overlay could be installed properly. Petitioner concluded that this work substantially prolonged the useful life of the pavement on the bridge.

### 06–1093

Petitioner performed this project for the TxDOT. Petitioner worked on the State Highway 356/Interstate Highway 35E/ U.S. Highway 75 bridge in Texas. Petitioner applied an epoxy overlay to restore the driving surface and protect the concrete deck from future corrosion. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### Misc. Jobs

Petitioner does not explain the jobs that it has included in this project. We understand petitioner not to argue that the work on this project was other than repair or maintenance.

### Rehabilitation Projects

### 02–861

Petitioner performed this project for the Dallas/Forth Worth Airport Authority. Petitioner worked on pavement at Dallas/Fort Worth Airport. Petitioner rehabilitated the pavement on the runway/taxiway. Petitioner concluded that this work substantially prolonged the useful life of the runway/ taxiway.

### 03–874

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on Interstate Highway 35 and Peachtree Road in Tarrant County, Texas. Petitioner rehabilitated pavement and joints. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 03–890

Petitioner performed this project for the ODOT. Petitioner worked on various bridges in Garvin, Lincoln, and Johnston

Counties, Oklahoma, near State Highways 18, 19, and 99. Petitioner sealed joints, patched bridge decks, and retrofitted beam ends. Petitioner concluded that this work substantially prolonged the useful lives of the bridges.

### 03–902

Petitioner performed this project for the ODOT. Petitioner worked on various bridges in Caddo and Love Counties, Oklahoma, near State Highways 32 and 58 and U.S. Highways 77 and 281. Petitioner sealed joints, patched bridge decks, and retrofitted beam ends. Petitioner concluded that this work substantially prolonged the useful lives of the bridges.

### 03–915

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on Interstate Highway 635 in Texas. Petitioner rehabilitated pavement and joints so that an asphalt overlay could be installed properly. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 04–950

Petitioner performed this project for the ODOT. Petitioner worked on bridges at U.S. Highways 39 and 77 in Cleveland and McClain Counties, Oklahoma. The bridges were rapidly deteriorating, and petitioner replaced the concrete decks and floor beams of the bridges. Petitioner's work allowed the load restrictions for truck traffic to be lifted. Petitioner concluded that this work substantially prolonged the useful lives of the bridges, materially increased their values, and adapted the bridges to new or different uses.

### 04–951

Petitioner performed this project for the ODOT. Petitioner worked on various bridges in Oklahoma at State Highways 14, 15, and 136. Petitioner removed existing lead paint (a perceived hazardous material), blasted the bridges to remove corrosion, and applied protective paint coatings designed to prevent future corrosion. Petitioner concluded that this work substantially prolonged the useful life of the bridges and materially increased their values.

## 04–958

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at State Highway 151 and Keystone Dam in Tulsa County, Oklahoma. Traffic had fallen through the bridge's deck, and concrete from the pavement had fallen down into the operating mechanisms of the hoist. Petitioner rehabilitated the concrete pavement of the bridge dam and rehabilitated a guardrail. Petitioner concluded that this work substantially extended the useful life of the bridge and materially increased its value.

## 04–960

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at State Highway 54 over Calvary Creek in Washita County, Oklahoma. Petitioner added structural steel to the bridge beams which increased the weight of loads that trucks could carry on the bridge. Petitioner concluded that this work substantially prolonged the useful life of the bridge and adapted it to a new or different use.

## 04–961

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at State Highway 54 over Horse & Deer Creeks in Custer County, Oklahoma. Petitioner added structural steel to the bridge beams which increased the weight of loads that trucks could carry on the bridge. Petitioner concluded that this work substantially prolonged the useful life of the bridge and adapted it to a new or different use.

## 04–969

Petitioner performed this project for the ODOT. Petitioner worked on four bridges on county roads in Oklahoma. Petitioner sealed joints, patched the decks of the bridges, and retrofitted beam ends. Petitioner concluded that this work substantially prolonged the useful lives of the bridges.

## 04–970

Petitioner performed this project for the ODOT. Petitioner worked on seven bridges in Oklahoma. Petitioner sealed joints, patched the decks of the bridges, and retrofitted beam

ends. Petitioner concluded that this work substantially prolonged the useful lives of the bridges.

### 04–983

Petitioner performed this project for the Town of Addison, Texas. Petitioner worked on pavement on a bridge on Belt Line Road in Addison. Petitioner rehabilitated pavement and joints so that an asphalt overlay could be installed properly. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 04–985

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at State Highway 151 and Keystone Dam in Tulsa County, Oklahoma. Petitioner rehabilitated concrete pavement across the dam and applied a sealant. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 04–986

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at State Highway 1 and Gaines Creek in Oklahoma. Petitioner rehabilitated the structural steel, removed old corroded steel, and applied a protective paint coating designed to prevent future corrosion. Petitioner concluded that this work substantially prolonged the useful life of the bridge and adapted it to a new or different use.

### 04–987

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at State Highway 99 over State Highway 3 and Creek in Pontotoc County, Oklahoma. Petitioner sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 05–1004

Petitioner performed this project for the ODOT. Petitioner worked on various steel bridges at Interstate Highway 44 at 12th and 19th Streets in Oklahoma County, Oklahoma. Petitioner sealed joints, patched the decks of the bridges, and retrofitted beam ends. Petitioner also removed existing lead

paint (a perceived hazardous material), blasted the bridges to remove corrosion, and applied protective paint coatings designed to prevent future corrosion. Petitioner concluded that this work substantially prolonged the useful lives of the bridges and materially increased their value.

### 05–1006

Petitioner performed this project for the NTTA. Petitioner cleaned and sealed pavement joints to prevent the intrusion of water. Petitioner concluded that this work substantially prolonged the useful life of the existing pavement.

### 05–1009

Petitioner performed this project for the TxDOT. Petitioner rehabilitated concrete traffic barrier walls. Petitioner concluded that this work substantially prolonged the useful life of the traffic barrier walls.

### 05–1013

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge at State Highway 15 and the Brazos River in Texas. Petitioner repositioned the rocker bearing assemblies and installed new stiffeners so that the bridge would not self-destruct. (A stiffener, sometimes called a gusset plate, is an accessory to a steel structure that restrains a distortion of some or all of the steel.) Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 05–1017

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on or at Interstate Highway 35 in Austin (Travis County), Texas. The armor joints on the bridge were coming loose and the steel was sticking up in the traffic. Petitioner rehabilitated the joints and the steel. The bridge would have been closed without this work. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 05–1020

Petitioner performed this project for the ODOT. Petitioner worked on a bridge in Oklahoma. Petitioner rehabilitated

pavement and joints so that an asphalt overlay could be installed properly. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 05–1022

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge at U.S. Highway 277 and Valley Creek in Abilene, Texas. Petitioner replaced the bearing pads on the bridge. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 05–1024

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge at U.S. Highway 59 in Lufkin, Texas. Petitioner rehabilitated the bridge joints. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1033

Petitioner performed this project for the NTTA. Petitioner worked on pavement. Petitioner routed and sealed cracks in the pavement to prevent moisture intrusion. Petitioner concluded that this work substantially prolonged the useful life of the pavement.

### 05–1046

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on U.S. Highway 75 in Grayson County, Texas. Work was also performed on parts of the railing and the deck. Petitioner cleaned and sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 05–1048

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at Interstate Highways 40 and 44 in Oklahoma County, Oklahoma. Petitioner removed existing lead paint (a perceived hazardous material), blasted the bridge to remove corrosion, and applied a protective paint coating designed to prevent future corrosion. Petitioner also rehabilitated part of the deck of the bridge. Petitioner con-

cluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1049

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at Interstate Highways 35 and 44 in Comanche and Garvin Counties, Oklahoma. Petitioner sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner also removed existing lead paint (a perceived hazardous material), blasted the bridge to remove corrosion, and applied a protective paint coating designed to prevent future corrosion. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1050

Petitioner performed this project for the ODOT. Petitioner worked on a bridge in Beckham County, Oklahoma. Petitioner sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner also removed existing lead paint (a perceived hazardous material), blasted the bridge to remove corrosion, and applied a protective paint coating designed to prevent future corrosion. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1051

Petitioner performed this project for the City of Forth Worth, Texas. Petitioner worked on a bridge on Riverside Drive in Fort Worth. Petitioner removed existing lead paint (a perceived hazardous material), blasted the bridge to remove corrosion, and applied a protective paint coating designed to prevent future corrosion. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 05–1061

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at Interstate Highway 35 and the Canadian River in Oklahoma. The expansion joints had failed, allowing the bridge deck to spall and deteriorate and allowing salt and/or water to get to the slab substructure. (In

the construction industry, the word "spall" as a noun refers to a surface defect and as a verb to the breaking up of a material to create a surface defect.) Petitioner rehabilitated the deck and the joints. Petitioner concluded that this work substantially extended the useful life of the bridge.

### 05–1062

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge at Loop 1 and Gaines Creek in Texas. The bearing pads had failed, and petitioner raised the bridge and installed new and updated pads to keep the bridge from destroying itself. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 05–1063

Petitioner performed this project for the NTTA. Petitioner changed the bearing pads on the Mountain Creek Lake Bridge to prevent damage at the beam/bearing seat interface. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 05–996

Petitioner performed this project for the City of Tulsa, Oklahoma. Petitioner worked on the Tulsa Oklahoma Civic Center. Petitioner rehabilitated and waterproofed the deck of the civic center. Petitioner concluded that this work substantially prolonged the useful life of the civic center.

### 05–997

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on Interstate Highway 10. Petitioner removed and replaced failing expansion joints that were allowing the bridge deck to deteriorate and letting moisture into the substructure. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 06–1067

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge at U.S. Highway 69 and Choctaw Creek in Texas. Petitioner sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner also removed existing

lead paint (a perceived hazardous material), blasted the bridge to remove corrosion, and applied a protective paint coating designed to prevent future corrosion. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

### 06–1068

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at State Highway 58 over the Washita River in Caddo County, Oklahoma. Petitioner sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 06–1070

Petitioner performed this project for the City of Oklahoma City, Oklahoma. Petitioner worked on the Oklahoma City Grandstand. The expansion joints and their supports were failing in various sections of the grandstand, and petitioner rehabilitated those joints. Without the rehabilitation, the grandstand would have been unusable and continuing to self-destruct. Petitioner concluded that this work substantially extended the useful life of the structure.

### 06–1075

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge at State Highways 82 and 87 in Texas. Petitioner strengthened and retrofitted the structural components to help the bridge regain and maintain its design loads carrying capacity. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 06–1076

Petitioner performed this project for the City of Lawton, Oklahoma. Petitioner worked on a bridge at Gore Boulevard and Cashe Road in Oklahoma. Petitioner sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner concluded that this work substantially prolonged the useful life of the bridge and materially increased its value.

## 06–1079

Petitioner performed this project for the ODOT. Petitioner worked on a bridge at U.S. Highways 62 and 74 in Oklahoma and Logan Counties, Oklahoma. Petitioner sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

## 06–1080

Petitioner performed this project for the City of Dallas, Texas. Petitioner reconfigured the streetscapes on Field, St. Paul, and Harwood Streets to provide better pedestrian movement and safety. Petitioner concluded that this work materially increased the value of the property and adapted the property to a new or different use.

## 06–1081

Petitioner performed this project for the City of Oklahoma City, Oklahoma. Petitioner worked on a bridge at Cimarron Road over Interstate Highway 40 in Oklahoma City. Petitioner sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

## 06–1082

Petitioner performed this project for the City of Oklahoma City, Oklahoma. Petitioner worked on the Rockwell Avenue Bridge in Oklahoma City. Petitioner sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

## 06–1088

Petitioner performed this project for the ODOT. Petitioner worked on the Rockwell Avenue Bridge in Oklahoma. Petitioner sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 06–1090

Petitioner performed this project for the NTTA. Petitioner worked on the entrance to a building in Plano, Texas. Petitioner modified the entrance to comply with the ADA. Petitioner concluded that this work substantially prolonged the useful life of the property, materially increased its value, and adapted the property to a new or different use.

### 06–1094

Petitioner performed this project for the NTTA. Petitioner rehabilitated concrete pavement and joints on a bridge so that an asphalt overlay could be installed properly. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### 06–1095

Petitioner performed this project for CPS Energy. Petitioner rehabilitated an old trolley bridge on Mission Road, increasing the load carrying capacity of the bridge to allow for trucks. Petitioner concluded that this work substantially prolonged the useful life of the bridge, materially increased its value, and adapted the bridge to a new or different use.

### 06–1096

Petitioner performed this project for the TxDOT. Petitioner worked on a bridge on Interstate Highway 20 in Texas. Petitioner sealed joints, patched the bridge deck, and retrofitted beam ends. Petitioner concluded that this work substantially prolonged the useful life of the bridge.

### OPINION

#### I. *Background*

We decide whether the disputed amount is DPGR. The parties agree that the disputed amount is DPGR to the extent that petitioner performed work on projects that erected or substantially renovated real property. In addition, the parties agree that petitioner's work substantially renovated real property to the extent that: (1) The work renovated a major component or substantial structural part of real property and (2) the renovations materially increased the value of the real property, substantially prolonged the useful life of the

real property, and/or adapted the real property to a different or new use. Further, the parties do not dispute that petitioner's work met the first prong of this two-part substantial renovation test.[6] Our decision therefore turns on whether petitioner's work erected property or, to the extent it did not, met the second prong of the test.[7]

Petitioner argues that it "erected" or "substantially renovated" real property and therefore the disputed amount is DPGR. Respondent argues that petitioner's work falls outside of the meanings of those terms and therefore the disputed amount is not DPGR. We agree with petitioner.

II. *Burden of Proof*

Respondent determined that none of the disputed amount is DPGR, and respondent's determination is presumed correct. See *Welch v. Helvering*, 290 U.S. 111, 115 (1933); see also *Interstate Transit Lines v. Commissioner*, 319 U.S. 590, 593 (1943) (stating that deductions are a matter of legislative grace for which taxpayers must prove their entitlement); cf. *Helvering v. Bliss*, 293 U.S. 144, 150–151 (1934) (stating that tax provisions should not be narrowly construed where, as here, they are "liberalizations of the law in the taxpayer's favor, * * * begotten from motives of public policy"). A taxpayer generally must prove the Commissioner's determination wrong in order to prevail. See Rule 142(a). Section 7491(a), however, sometimes places the burden of proof upon the Commissioner.

The record allows us to decide this case without regard to which party bears the burden of proof. We proceed to do so. We need not and do not decide which party bears the burden of proof.

---

[6] Respondent concedes in his opening brief that petitioner's work on the bridges met the first prong but advances no argument as to petitioner's work on the other types of property. Each of those other types of property is "real property" within the meaning of sec. 199 because it is either a building or other property that is and ordinarily will remain affixed to real property for an indefinite period. See sec. 1.199–3(m)(2)(i), Income Tax Regs.; see also sec. 1.263A–8(c)(3), Income Tax Regs. Furthermore, we find in the record that petitioner's work on these other types of property renovated a major component or a substantial structural part of that property. We conclude that all of the properties in dispute meet the first prong of this two-part test.

[7] Hereinafter, we use the term "disputed projects" to refer to the 104 projects discussed *supra* p. 198, less the 5 of those projects that petitioner characterizes as repair or maintenance.

III. *Section 199*

A. *Applicable Text*

Our substantive analysis begins with the relevant text of section 199. (We set forth that text in appendix D.) Section 199(a) allows a corporate taxpayer such as petitioner to deduct a percentage (equal to 3 percent for the subject year) of the lesser of (1) its qualified production activities income or (2) its taxable income (as computed without regard to the deduction under section 199(a)). Section 199(b)(1) limits that deduction to 50 percent of the wages that the taxpayer pays during the year. Section 199(c)(1) defines the term "qualified production activities income" as the taxpayer's DPGR less the sum of its cost of goods sold (allocable to the DPGR) plus certain expenses and other items. Section 199(c)(4)(A)(ii) provides that DPGR includes a taxpayer's gross receipts from the construction of real property performed in the United States if the taxpayer is engaged in the active conduct of a construction business and the gross receipts are derived in the ordinary course of that business.

Section 199 does not define the phrase "construction of real property" as its appears in section 199(c)(4)(A)(ii), and it is the meaning of that phrase that is the focus of our analysis. The parties do not dispute that petitioner is entitled to a deduction under section 199(a) to the extent that petitioner's work on the disputed projects falls within the meaning of that phrase. Nor do the parties dispute that petitioner's work will fall within the meaning of that phrase if the work "erected" or "substantially renovated" real property within the meaning of section 1.199–3(m), Income Tax Regs.

B. *Legislative History*

Section 199 was added to the Code by the American Jobs Creation Act of 2004 (AJCA), Pub. L. 108–357, sec. 102(a), 118 Stat. 1424, to give domestic manufacturers a tax deduction for certain domestic production activities. The conferees noted that then-present law did not reduce a corporate taxpayer's income tax for income from domestic activities and stated that section 199 would provide such a reduction in certain cases. See H. Conf. Rept. 108–755, at 265–275 (2004). The conferees stated that "construction activities performed

in the United States" was one of those cases, that "activities that are directly related to the erection or substantial renovation of residential and commercial buildings and infrastructure" were "construction activities", and that "structural improvements, but not mere cosmetic changes, such as painting" were "substantial renovation". *Id.* at 271 & n.26. The name of the AJCA and the statute's wage limitation on the amount of the deduction under section 199(a) indicate that Congress intended that section 199 create jobs in the United States and otherwise strengthen the U.S. economy.

IV. *Guidance From the Commissioner and From the Secretary*

A. *Notice 2005–14*

On January 19, 2005, the Commissioner released Notice 2005–14, 2005–1 C.B. 498, to provide "interim guidance" on section 199. The notice stated that the Secretary was currently developing regulations under section 199 and that taxpayers could rely on the interim guidance until the regulations were issued. *Id.* sec. 1, 2005–1 C.B. at 502.

As relevant here, Notice 2005–14, sec. 4.04(11)(a) and (b), 2005–1 C.B. at 520, stated that "The term 'construction' means the construction or erection of real property" and that

Activities constituting construction include activities performed in connection with a project to erect or substantially renovate real property, but do not include tangential services such as hauling trash and debris, and delivering materials, even if the tangential services are essential for construction. However, if the taxpayer performing construction also, in connection with the construction project, provides tangential services such as delivering materials to the construction site and removing its construction debris, the gross receipts derived from the tangential services are DPGR. Improving land (for example, grading and landscaping) and painting are activities constituting construction only if these activities are performed in connection with other activities (whether or not by the same taxpayer) that constitute the erection or substantial renovation of real property. * * *

Notice 2005–14, sec. 4.04(11)(d), 2005–1 C.B. at 520, stated that the "term 'substantial renovation' means the renovation of a major component or substantial structural part of real property that materially increases the value of the property, substantially prolongs the useful life of the property, or adapts the property to a new or different use." Notice 2005–

14, sec. 3.04(11)(d), 2005–1 C.B. at 511, explained as to that meaning:

The Service and Treasury Department believe that the standard to be applied in determining whether there has been a substantial renovation of real property is the standard applied under § 263(a) to determine whether a taxpayer's activities result in permanent improvements or betterments of property, such that the cost of the activities must be capitalized * * * [and that the definition of the term substantial renovation as set forth in the notice is] consistent with the rules under § 263(a) * * *

B. *2005 Proposed Regulations*

On November 4, 2005, the Secretary published proposed regulations under section 199. See secs. 1.199–0 through 1.199–8, Proposed Income Tax Regs., 70 Fed. Reg. 67240 (Nov. 4, 2005). The proposed regulations stated that the final regulations, when published, would apply to taxable years beginning after December 31, 2004. See sec. 1.199–8(g), Proposed Income Tax Regs., 70 Fed. Reg. 67276 (Nov. 4, 2005). The proposed regulations stated that taxpayers could rely on the proposed regulations and/or the interim guidance set forth in Notice 2005–14, *supra*, until the final regulations were published in the Federal Register. See *id.*

The definition of the word "construction" in the proposed regulations was similar to its definition in Notice 2005–14, *supra*. Section 1.199–3(l)(1)(i) and (2), Proposed Income Tax Regs., 70 Fed. Reg. 67254, 67255 (Nov. 4, 2005), stated that "The term *construction* means the construction or erection of real property" and

Activities constituting construction include activities performed in connection with a project to erect or substantially renovate real property, but do not include tangential services such as hauling trash and debris, and delivering materials, even if the tangential services are essential for construction. However, if the taxpayer performing construction also, in connection with the construction project, provides tangential services such as delivering materials to the construction site and removing its construction debris, the gross receipts derived from the tangential services are DPGR. Improvements to land that are not capitalized to the land (for example, landscaping) and painting are activities constituting construction only if these activities are performed in connection with other activities (whether or not by the same taxpayer) that constitute the erection or substantial renovation of real property * * *

The proposed regulations also followed the definition of the term "substantial renovation" set forth in Notice 2005–14,

*supra*. Section 1.199–3(l)(4), Proposed Income Tax Regs., 70 Fed. Reg. 67255 (Nov. 4, 2005), stated that the "term *substantial renovation* means the renovation of a major component or substantial structural part of real property that materially increases the value of the property, substantially prolongs the useful life of the property, or adapts the property to a new or different use." While this definition adopted some of the grounds for capitalization under section 263(a) and the regulations thereunder, see sec. 1.263(a)–1(b), Income Tax Regs. (stating that an expense is generally a capital expenditure if the expense adds to the value or substantially prolongs the useful life of property owned by the taxpayer or adapts the property to a new or different use), the proposed regulations did not explicitly adopt all of those grounds. The proposed regulations, for example, did not explicitly adopt the standard of section 1.263(a)–2(a), Income Tax Regs., that "The cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year" is a capital expenditure. See also *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 87–89 (1992) (holding that an expenditure that produces a significant future benefit is a capital expenditure under section 263(a)).

### C. *2006 Final Regulations*

On June 1, 2006, the Secretary published final regulations under section 199. See secs. 1.199–0 through 1.199–9, Income Tax Regs., 71 Fed. Reg. 31283 (June 1, 2006). The final regulations are applicable to taxable years beginning on or after June 1, 2006. See sec. 1.199–8(i)(1), Income Tax Regs. The final regulations also stated, however, that a taxpayer could rely on the final regulations for taxable years beginning before May 18, 2006, provided that the taxpayer followed all of those final regulations. See *id.* The final regulations stated that taxpayers who do not rely on the final regulations for taxable years beginning before June 1, 2006, may rely on the proposed regulations and/or the interim guidance set forth in Notice 2005–14, *supra*. See *id.*

The final regulations stated that "The term *construction* means activities and services relating to the construction or

erection of real property". Sec. 1.199–3(m)(i)(1), Income Tax Regs. The final regulations also stated:

Activities constituting construction are activities performed in connection with a project to erect or substantially renovate real property * * *

* * * Activities constituting construction do not include tangential services such as hauling trash and debris, and delivering materials, even if the tangential services are essential for construction. However, if the taxpayer performing construction also, in connection with the construction project, provides tangential services such as delivering materials to the construction site and removing its construction debris, then the gross receipts derived from the tangential services are DPGR.

* * * Improvements to land that are not capitalizable to the land (for example, landscaping) and painting are activities constituting construction only if these activities are performed in connection with other activities (whether or not by the same taxpayer) that constitute the erection or substantial renovation of real property * * *

[Sec. 1.199–3(m)(2), Income Tax Regs.]

The final regulations further stated (as did Notice 2005–14, *supra*, and the proposed regulations) that "the term *substantial renovation* means the renovation of a major component or substantial structural part of real property that materially increases the value of the property, substantially prolongs the useful life of the property, or adapts the property to a new or different use." Sec. 1.199–3(m)(5), Income Tax Regs. The final regulations, like the proposed regulations, did not explicitly adopt other grounds for capitalization under section 263(a) and the regulations thereunder.

## V. *Expert Testimony*

### A. *Overview*

Each party relies on expert testimony to support its or his view that petitioner's work is or is not the erection or substantial renovation of real property. Petitioner called two individuals to testify as experts on engineering in the context of petitioner's business. Respondent called one individual to testify as an expert on construction engineering and construction management. The Court recognized each of the three individuals as an expert. The Court also received into evidence each individual's written report (as supplemented, in the cases of the individuals called by petitioner). See Rule 143(g) (stating that an expert witness shall submit to the

Court a written report that serves as his or her direct testimony).

B. *Petitioner's Experts*

1. *Mr. Gibson*

William E. Gibson (Mr. Gibson) was one of petitioner's experts. Mr. Gibson is a licensed professional engineer, and he earned a bachelor of science degree in civil engineering in 1966 and a master of business administration degree in management in 1968. He has worked with highway and bridge construction for over 40 years, he has worked with structural rehabilitation for over 20 years, and he works currently for petitioner as its chief executive officer.[8] Mr. Gibson is an active member of many associations/societies of engineers, and he or petitioner has received numerous awards for his or its work in the field of construction. He has advised Federal and State highway departments on the construction of bridges and of other infrastructure.

Mr. Gibson is familiar with the specific work that petitioner performed on each of its projects. He reinforced that familiarity by examining petitioner's documents relating to the projects and by visiting a substantial number of the jobsites. He classified the projects into the following groups: (1) Those projects which extended the useful life of real property by more than 3 years; (2) those projects which increased the value of real property by more than 5 percent of the component being worked upon; (3) those projects that adapted the property or component to a new or different use; and (4) those projects that were part of new construction. He characterized the remaining projects which did not fall into one of these four categories as routine maintenance or repairs.

Mr. Gibson concluded from his analysis that petitioner's work on over 95 percent of the disputed projects was substantial renovation within the meaning of the final regulations and their predecessors. His report, as supplemented, supported his conclusion with vast amounts of data and with many diagrams, charts, and pictures depicting the specific construction work petitioner performed. His report, as

---

[8] Mr. Gibson also has a significant financial interest in petitioner.

supplemented, further supported his conclusion with detailed bid sheets for the projects and with articles and treatises relating to pavement preservation, the extension of the useful life of roads and bridges, the improvement of the condition of bridges, and bridge management.

### 2. *Mr. Smith*

Douglas L. Smith (Mr. Smith) was petitioner's other expert. Mr. Smith is a licensed professional engineer, and he earned a bachelor of science degree in civil engineering in 1983 and a master of science degree in civil engineering in 1985. He has worked with building or infrastructure construction for over 18 years, and he is an active member of various societies of engineers. He currently works for a consulting, engineering, architectural, and materials science firm that is unrelated to petitioner. He and the firm specialize in investigating and repairing infrastructure that fails to meet performance expectations because of deterioration, collapse, or the like. The firm's main clients are State highway departments and the Federal Government.

Mr. Smith reviewed all of the disputed projects, including 24 in depth (which represented most of petitioner's gross receipts for the subject year), and he visited 11 of the jobsites. He scrutinized the projects and bid sheets, and he spoke to persons who worked on the projects. He concluded that petitioner's work on the disputed projects often was required by deterioration caused by the owner's failure to properly maintain the real property and that rehabilitation of the real property, as opposed to repair, was essential to the survival of the real property. He concluded that the bridge joints that petitioner rehabilitated had deteriorated before petitioner's work, that the deteriorated joints were harming other parts of the bridges, and that petitioner had to tailor its work to protect the structure of the bridges prospectively. He concluded that some of petitioner's work, e.g., replacement of bearing pads, was necessitated by design defects in the originally installed parts and was not routine maintenance. He concluded that petitioner's work on pavement in job No. 02–861 (and in another job not in dispute) substantially prolonged the useful life of the pavement and increased its value.

C. *Respondent's Expert*

Respondent's expert was Jeff Ronspies (Mr. Ronspies). Mr. Ronspies received a bachelor of science degree in civil engineering in 1995 and a juris doctorate in 2006. He worked as an engineer from 1995 through 2004, and he worked as an attorney for a year and a half during 2006 and 2007. From August 2007 to date, he has worked as a general engineer for the Internal Revenue Service, primarily "Gather[ing] facts related to fixed asset and intangible asset audits [and] Draft[ing] reports used in administrative appeal of audits, and rebuttals to taxpayer protests of proposed tax adjustments." Mr. Ronspies is not a licensed engineer, he is not a current member of any engineering society, and he has never published a paper on engineering. Nor has Mr. Ronspies ever worked as an engineer on a construction project involving bridges, roads, or other infrastructure, other than in his role as an overseer of a firm's basic painting operations.

Mr. Ronspies reviewed the bid calculations and the descriptions of all of petitioner's projects, and he visited 10 of the jobsites (all within the Dallas/Fort Worth metropolitan area). He concluded that 29 of petitioner's 136 projects qualified as substantial renovation of real property within the meaning of the final regulations, and these 29 projects became (and are) the subject of respondent's concession. Mr. Ronspies concluded that the remaining projects (i.e., the disputed projects plus the projects petitioner conceded) were either repair or maintenance or "accounting anomalies". The "accounting anomalies", Mr. Ronspies stated, were projects with no receipts or job costs for the subject year. Mr. Ronspies explained that he characterized projects as repair or maintenance because petitioner worked on only part of a structure, leaving the rest of the structure to deteriorate at the same rate as before. Mr. Ronspies opined that the useful life of a structure as a whole does not change if work is performed on only part of the structure.

D. *General Rules Applicable to Expert Testimony*

Expert testimony is admissible where it assists the Court to understand the evidence or to determine a fact in issue. See Fed. R. Evid. 702; see also *ASAT, Inc. v. Commissioner*, 108 T.C. 147, 168 (1997). The testimony of an expert does not

assist the Court when the testimony merely expresses a legal conclusion. See *Alumax, Inc. v. Commissioner*, 109 T.C. 133, 171 (1997), affd. 165 F.3d 822 (11th Cir. 1999). Determining whether expert testimony is helpful to the Court is a matter within the Court's sound discretion. See *Laureys v. Commissioner*, 92 T.C. 101, 127 (1989).

We have broad discretion to evaluate the cogency of an expert's analysis. Sometimes, an expert will help us decide a case. See, e.g., *Trans City Life Ins. Co. v. Commissioner*, 106 T.C. 274, 302 (1996). Other times, he or she will not. See, e.g., *Estate of Scanlan v. Commissioner*, T.C. Memo. 1996–331, affd. without published opinion 116 F.3d 1476 (5th Cir. 1997). We weigh an expert's testimony in the light of his or her qualifications and with due regard to all other credible evidence in the record. We may embrace or reject an expert's opinion in toto, or we may pick and choose the portions of the opinion we choose to adopt. See *Helvering v. Natl. Grocery Co.*, 304 U.S. 282, 294–295 (1938); *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974–285; *IT&S of Iowa, Inc. v. Commissioner*, 97 T.C. 496, 508 (1991); *Parker v. Commissioner*, 86 T.C. 547, 562 (1986). We are not bound by an expert's opinion and will reject an expert's opinion to the extent that it is contrary to the judgment we form on the basis of our understanding of the record as a whole. See *Orth v. Commissioner*, 813 F.2d 837, 842 (7th Cir. 1987), affg. *Lio v. Commissioner*, 85 T.C. 56 (1985); *Silverman v. Commissioner*, *supra* at 933; *IT&S of Iowa, Inc. v. Commissioner*, *supra* at 508; *Chiu v. Commissioner*, 84 T.C. 722, 734 (1985).

## VI. *Standards of Substantial Renovation*

### A. *Applicable Guidance*

Section 199(c)(4)(A)(ii) states that DPGR is derived from the "construction of real property performed in the United States", but section 199 does not define the word "construction". Petitioner relies in part upon the final regulations to assert that its work on the disputed projects qualifies as construction because those projects involved erecting or substantially renovating real property. Petitioner also relies upon the final regulations to assert that some of its work substantially renovated real property because petitioner ren-

ovated a major component or substantial structural part of real property and that work materially increased the value of the property, substantially prolonged the useful life of the property, or adapted the property to a new or different use.

By their terms, the final regulations are not necessarily applicable to this case because the subject year began before June 1, 2006. The final regulations, however, allow a taxpayer such as petitioner to rely upon those regulations for taxable years beginning before May 18, 2006. See sec. 1.199–8(i)(1), Income Tax Regs. Petitioner relies on portions of the final regulations to support its position. Petitioner's reliance on portions of the final regulations means those regulations are applicable to this case in their entirety. See *id.* Petitioner's reliance on portions of the final regulations also means that the other above-discussed guidance from the Secretary and from the Commissioner is not directly applicable to this case.

## B. *Overview*

We proceed to decide the meaning of the phrases "materially increases the value of the property", "substantially prolongs the useful life of the property", and "adapts the property to a new or different use", as used in section 1.199–3(m)(5), Income Tax Regs. These phrases had their genesis in the capitalization rules set forth in section 263(a) and the regulations thereunder. See Notice 2005–14, sec. 3.04(11)(d); see also sec. 1.263(a)–1(b), Income Tax Regs. The increased value, prolonged useful life, and adapted use standards contained in those phrases are measured by reference to the "real property" (here, primarily infrastructure), inclusive of all of its components and parts. See sec. 1.199–3(m)(3) and (4), Income Tax Regs.;[9] see also sec. 1.199–3(m)(5), Income

---

[9] Sec. 1.199–3(m), Income Tax Regs., defines the terms "real property" and "infrastructure" as follows:

(3) Definition of real property.—The term *real property* means buildings (including items that are structural components of such buildings), inherently permanent structures (as defined in § 1.263A–8(c)(3)) other than machinery (as defined in § 1.263A–8(c)(4)) (including items that are structural components of such inherently permanent structures), inherently permanent land improvements, oil and gas wells, and infrastructure (as defined in paragraph (m)(4) of this section). * * * For purposes of this paragraph (m)(3), structural components of buildings and inherently permanent structures include property such as walls, partitions, doors, wiring, plumbing, central air conditioning and heating systems, pipes and ducts, elevators and escalators, and other similar property.

Continued

Tax Regs. (using the words "the property" in reference to the words "real property").

The words "real property", in turn, are best understood to refer to each freestanding item of real property that operates and performs a discrete function in and of itself. Cf. *Smith v. Commissioner*, 300 F.3d 1023, 1030 (9th Cir. 2002) (holding that aluminum reduction cells were sufficiently free-standing to constitute units of property separate and apart from the interconnected cell lines in aluminum smelting facility, for purposes of characterizing the expense of replacing the cell linings as a repair), affg. *Vanalco, Inc. v. Commissioner*, T.C. Memo. 1999–265; *Ingram Indus., Inc. v. Commissioner*, T.C. Memo. 2000–323 (holding that tugboat engines were not treated separately from tugboats in determining whether engine repair costs were capital expenditures); sec. 1.263A–10(b)(1), Income Tax Regs. (stating that a unit of real property includes any components of real property owned by the taxpayer that are functionally interdependent). Thus, the relevant property that we analyze to measure whether a standard of substantial renovation is met is generally each building, bridge, or other permanent structure on which petitioner worked. As the expert testimony in this case shows, each of the bridges and the other real property at issue normally is constructed with a number of major interrelated components any one of which is critical to the property's overall functionality, and the separate components of the property generally do not perform a discrete function in the setting of the property as a whole that would allow the component to operate and be used by itself. To the contrary, the placing in service of one component (i.e., the readiness and availability of that component for its specific use) is generally dependent on the placing in service of the other components of the bridge or the other real property.

### C. *Repairs*

The capitalization rules of section 263(a) and the regulations thereunder do not treat an expense to repair property as a capital expenditure. Such an expense is not a capital

---

(4) Definition of infrastructure.—The term *infrastructure* includes roads, power lines, water systems, railroad spurs, communications facilities, sewers, sidewalks, cable, and wiring. The term also includes inherently permanent oil and gas platforms.

expenditure because it fails to increase the value or prolong the useful life of the property (or adapt the property to a different or new use). See *Plainfield-Union Water Co. v. Commissioner*, 39 T.C. 333, 338 (1962). [10] Instead, the repair generally keeps the property in its ordinarily efficient operating condition over the useful life for which it was acquired. See *Ill. Merchs. Trust Co. v. Commissioner*, 4 B.T.A. 103, 106 (1926); see also sec. 1.162–4, Income Tax Regs. (stating that "incidental repairs" do not "materially add to the value of the property" or "appreciably prolong its life, but keep it in an ordinarily efficient operating condition" and that "Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall * * * be capitalized"). Whether an expense is a repair is a factual determination that turns on a finding that the work did or did not prolong the life of the property, increase its value, or make it adaptable to a different use. See *R.R. Hensler, Inc. v. Commissioner*, 73 T.C. 168, 178–182 (1979).

Sometimes, an expense that would otherwise be characterized as a repair may be characterized as a capital expenditure if the expense is part of the property's rehabilitation, modernization, and improvement. See *United States v. Wehrli*, 400 F.2d 686, 689–690 (10th Cir. 1968); *Jones v. Commissioner*, 242 F.2d 616 (5th Cir. 1957), affg. 24 T.C. 563 (1955). Such may be so even if the property was not completely out of service or in total disrepair. See *Norwest Corp. & Subs. v. Commissioner*, 108 T.C. 265, 279–280 (1997) (holding that the costs of removing asbestos-containing materials must be capitalized because they were part of a general plan of rehabilitation and renovation that improved the building); see also *Bank of Houston v. Commissioner*, T.C. Memo. 1960–110. In addition, the Secretary has proposed a regulation under which an expense is a capital expenditure, rather than a repair, where the property has deteriorated to

---

[10] In *Plainfield-Union Water Co. v. Commissioner*, 39 T.C. 333, 338 (1962), the taxpayer claimed deductions for the cleaning and lining of cement pipe which restored the original water-carrying capacity of the pipes. The Court held that the expenses were repairs because the taxpayer continued to use the property in its normal course of business and the useful life of the water main was not increased, nor was its strength or capacity enhanced. *Id.* The Court noted that a repair returns property to the state it was before the condition necessitating the expenditure arose and does not make the property more valuable, more useful, or longer lived. *Id.* The Court noted that a capital expenditure under sec. 263(a) generally results in a longer lasting increase in the longevity, utility, or worth of the property. *Id.*; see also *Norwest Corp. & Subs. v. Commissioner*, 108 T.C. 265, 279–280 (1997).

a state of disrepair and is no longer functional for its intended use and the expense returns the property to its former ordinarily efficient operating condition. See sec. 1.263(a)–3(e)(2)(iv), Proposed Income Tax Regs., 73 Fed. Reg. 12859 (Mar. 10, 2008).

### D. *Substantial Renovation Standards*

#### 1. *Materially Increases the Value*

A taxpayer's receipts may be DPGR if the receipts are attributable to renovations that materially increase the value of real property. See sec. 1.199–3(m)(5), Income Tax Regs. Respondent asserts that a material increase in the value of real property in the context of public works projects requires that the functional value of the property increase on account of the project. We agree. See *Plainfield-Union Water Co. v. Commissioner*, *supra* at 338. Each of petitioner's projects may have materially increased the value of the underlying real property only to the extent that the project led to a more permanent increment in the longevity, utility, or worth of the property. Such a permanent increment may have occurred, for example, if the project rehabilitated a critical component of the property, thus making the rehabilitation tantamount to replacing the property as a whole.

An increase in value following a casualty is measured by comparing the value of the real property after the project with the value of the real property before the casualty. See *R.R. Hensler, Inc. v. Commissioner*, *supra* at 180–182. An increase in value in other cases is measured by comparing the value of the real property after the project with the value of the real property before the project. See *Plainfield-Union Water Co. v. Commissioner*, *supra* at 337. In all cases, any increase in value must be "material" to qualify the receipts as DPGR.

#### 2. *Substantially Prolongs the Useful Life*

A project may substantially prolong the useful life of property if the project rehabilitates a critical and functional component of the property and gives the property a new life expectancy. See *Smith v. Commissioner*, 300 F.3d 1023 (9th Cir. 2002). The replacement of a component that is so integral to the overall functioning of property effectively con-

fers a new lifespan on the property equivalent to the life of the component. *Id.* at 1033. The useful life of property may be substantially prolonged where the useful life of the property as a whole was increased or the replacement of a component effectively increased the useful life of the property.

An increase in useful life following a casualty is measured by comparing the useful life of the real property after the project with the remaining useful life of the real property before the casualty. See *R.R. Hensler, Inc. v. Commissioner*, *supra* at 180–182. An increase in useful life in other cases is measured by comparing the useful life of the real property after the project with the remaining useful life of the real property before the project. See *Plainfield-Union Water Co. v. Commissioner*, 39 T.C. at 337; *Ill. Merchs. Trust Co. v. Commissioner*, 4 B.T.A. at 106. In all cases, any prolonging of useful life must be "substantial" to qualify the receipts as DPGR.

### 3. *Adapts the Property to a New or Different Use*

Property is adapted to a new or different use if the use of the property after the project is not consistent with the taxpayer's intended use of the property before the project. As the parties acknowledge, and we agree, such an adaption often corresponds to a material increase in value or to a substantial prolonging of useful life. If a project qualifies as a substantial renovation under either one of the other two standards, it is not necessary to determine whether the property also is adapted for a new or different use.

Job No. 05–1011 is the only project that petitioner characterized as adapting property to a new or different use without substantially prolonging the useful life of the property or materially increasing its value. There, petitioner was paid approximately $30,000 to modify a handrail (and to remove and to replace concrete) to comply with the ADA. Petitioner concluded that this work adapted the property to a new or different use. We agree. Petitioner's modification of the handrail allowed access to the property by those persons to whom the ADA applied, and the handrail could not have been so used without the modifications. We sustain petitioner's conclusion that this project qualified under section 199 without further specific discussion of this project.

VII. *Characterization of Remaining Projects*

A. *Overview*

We now consider whether petitioner's work on the remaining disputed projects was the erection or substantial renovation of real property. We do so on a project by project basis. We are aided by the testimony of Messrs. Gibson and Smith, both of whom are licensed, well-credentialed, and knowledgeable longtime prominent professional engineers in the fields of highway and bridge construction and structural rehabilitation. We heard them and perceived them to be more knowledgeable and reliable than Mr. Ronspies on the matter at hand, and we find the testimony of Messrs. Gibson and Smith to be sincere and most persuasive.[11] Mr. Ronspies, on the other hand, lacks any practical experience in road and bridge construction, and we decline to accept his testimony on that subject to the extent that it conflicts with the testimony of Messrs. Gibson and Smith. We note as to Mr. Ronspies that he ultimately agreed that 7 of petitioner's 10 bridge projects that he visited qualified under section 199 and acknowledged that his opinion as to the qualification of petitioner's remaining projects might have changed had he visited them as well.

Petitioner asserts that its work on each disputed project erected real property or substantially renovated real property. We agree. Petitioner erected real property in job Nos. 04–937 (a blast fence), 04–965 (additional lanes and driveways), 04–971 (a ramp), 05–1002 (a traffic rail and a bridge deck), 05–1043 (additional turn lanes), and 06–1069 (a retaining wall).[12] In the other projects, petitioner: (1) Renovated major components or substantial structural parts of infrastructure; (2) addressed design errors or construction flaws by restoring infrastructure to perform efficiently as intended; (3) allowed infrastructure to be put back in service after damage or severe deterioration; (4) returned a major component from a deteriorated state, either from age, exposure, or casualty loss, to its former operational efficiency; (5)

---

[11] Of course, we recognize that the interests of petitioner and Mr. Gibson overlap in that he is petitioner's chief executive officer and has a significant financial interest in this matter. We have taken those considerations into account in our evaluation of his testimony and have concluded that his testimony was sincere and credible.

[12] Mr. Ronspies now agrees that job No. 04–937 qualifies under sec. 199.

abated environmental hazards, e.g., by removing or encapsulating lead paint; and/or (6) brought infrastructure into compliance with laws such as the ADA. Petitioner's work on these other projects effected the renovation of a major component or substantial structural part of real property, and we conclude from our description of each project (as set forth in our findings of fact and in appendixes A, B, and C) and our consideration of the expert testimony of Messrs. Gibson and Smith that the work materially increased the value of the real property and/or substantially prolonged the useful life of the real property.

### B. *Conclusions as to Specific Projects*

#### 1. *Casualty Projects*

The 18 casualty projects in dispute involved petitioner's work on damaged infrastructure (mainly bridges) that either were completely inoperative (e.g., not open to traffic) or not fully operative. Petitioner restored the integrity of the infrastructure through substantial structural rehabilitation that allowed the infrastructure to function as intended for many years thereafter. Much of the infrastructure was of little to no use without petitioner's work. Petitioner's final contract amount for each project ranged from $11,500 to $640,994.

We conclude from the record at hand that the functionality and dollar values of the real property underlying most of the casualty projects increased substantially on account of petitioner's work. We also conclude that for those projects, and for each of the other casualty projects for which petitioner does not assert a material increase in value (specifically, job Nos. 05–1023, 05–999, 06–1074, 06–1078, 06–1084, 06–1087, and 06–1091), that petitioner's work substantially prolonged the useful life of the infrastructure.

#### 2. *New Construction and Rehabilitation Projects*

The remaining 80 projects in dispute (i.e., the 86 remaining projects in dispute less the 6 projects that erected real property) involved work that petitioner performed primarily as a subcontractor, which petitioner calls "New Construction", and work that petitioner performed as a contractor rehabilitating dilapidated real property, which petitioner calls "Rehabilitation Projects". While petitioner places

these projects into two categories primarily on the basis of its role as a contractor or a subcontractor, we do not do similarly. Each project ultimately involves the rehabilitation of dilapidated real property, and we do not think the characterization of petitioner's work is any different just because petitioner performed its work as a contractor versus a subcontractor. To be sure, petitioner's work on the "new projects" was just as new as its work on the "rehabilitation projects".

Petitioner concluded that its work on each of these projects substantially prolonged the useful life of the underlying real property. We agree.[13] That real property (typically bridges) had deteriorated to a state of disrepair on account of a lack of proper maintenance, and the real property was no longer functioning as intended. Petitioner significantly improved and solidified the integrity of the dilapidated bridges and the other real property through petitioner's renovation and redesign of major structural components thereof (e.g., beams and joints), and petitioner performed other services such as corrosion protection, pavement rehabilitation, and expansive joint rehabilitation. Petitioner's work enhanced the operating condition of the real property for many years into the future. Mr. Gibson concluded that each of these projects increased the useful life of the real property by more than 3 years, and we find that conclusion persuasive taking into account the specialized work petitioner did on each project and the final contract amounts (ranging from $3,990 to $2,748,957) for these projects.[14]

## C. *Additional Rationale for All Projects*

Respondent argues that petitioner's work on the casualty projects "merely brought the bridges back to their normal operating condition" and that petitioner's work on the new construction and rehabilitation projects was routine maintenance. We disagree. Petitioner's work on many of the projects

---

[13] Petitioner also concluded that its work on 16 of these projects materially increased the value of the underlying real property. We need not consider this conclusion given our agreement with petitioner's primary conclusion.

[14] As to one of the projects in issue, job No. 03–921, petitioner's sole work was "patching" the deck of the bridge. While this work in and of itself would appear to be routine maintenance, petitioner performed this work as a subcontractor on a larger project that rehabilitated the bridge. Given the additional facts that petitioner's final contract amount for this job was $105,646 and that the job was paid for with Federal funds, we conclude that petitioner's work was part of a substantial renovation of the bridge and classify it as such.

was critical and essential to the well-being and future operation of the structures underlying the projects. Petitioner, for example, removed and replaced the joints on bridges because the old joints were failing from lack of proper maintenance and threatening the structure of each of the bridges as a whole. Similarly, petitioner replaced damaged or deteriorated beams with new beams to give the bridge its requisite support. Likewise, petitioner rehabilitated a beam using specialized materials and procedures such as epoxy, heat, and mechanical force.

Mr. Gibson explained that petitioner performed six types of specialized work on the disputed projects and that this work either (or both) substantially prolonged the useful life of the structure underlying the project or materially increased its value. Mr. Gibson listed this work as corrosion protection, concrete structural renovation, steel structural renovation, pavement rehabilitation, implementation of structure redesign, and expansion joint rehabilitation. He described each of these types of work as follows:

*Corrosion protection*: Involves the removal of all rust and corrosion on the existing structural steel components and then the application of a three coat corrosion protection system to the structure. The three coat process involves a base layer of zinc to protect the steel from rust, a second epoxy layer to protect the base layer, and a final UV layer to protect the epoxy layer. The deteriorated steel beam ends must be removed and replaced before the cleaning and painting takes place. (A beam end is the portion of the beam beneath a joint in the deck of the bridge.) This protection generally allows the load carrying capacity of a bridge to be increased to its original limits and extends the useful life of the structure.

*Concrete structural renovation*: Involves a structural renovation of a concrete bridge. Without the renovation, the bridge does not function as originally designed (e.g., some lanes must be closed to traffic).

*Steel structural renovation*: Involves a structural renovation of steel on a bridge. Without the renovation, the bridge does not function as originally designed (e.g., some lanes must be closed to traffic). This work extends the useful life of the bridge.

*Pavement rehabilitation*: Involves the joint and spall rehabilitation of the pavement of a bridge. This process extends the useful life of the bridge by 10 to 15 years.

*Implementation of structure redesign*: Involves three different types of projects. The first type involves the strengthening of structural steel, the replacement of spalled concrete, the installation of new bearing pads, and the painting of the bridge. (The bearings on a bridge allow the bridge to expand, contract, flex, and vibrate without a transfer of the resulting stress into adjacent support elements.) The second type involves the

replacement of an old bridge by a new, longer, and wider bridge. This is done by removing the old bridge deck, adding shear connectors to the steel stringers (to increase the load carrying capacity), cleaning and painting the bridge, moving the new bridge into position, and pouring concrete to serve as the deck of the bridge. (A stringer is a steel beam spanning lengthwise in a bridge.) The third type involves raising a bridge to increase the clearance between the bottom of the bridge and the roadway below.

*Expansion joint rehabilitation*: This involves rehabilitating deteriorated expansion joints to increase the useful life of the bridge.

Mr. Ronspies opined that petitioner's work was primarily routine maintenance, and he identified the following types of work performed by petitioner as routine maintenance: (1) Joint replacement (because, he stated, joints do not have the expected life of the concrete or structural steel bridge spans, and it is recommended that joints be replaced regularly); (2) rehabilitation or replacement of bridge bearings (because, he stated, this work is typically performed as part of a scheduled maintenance program); (3) patching of concrete or asphalt by removing deteriorated concrete and replacing it with new material (because, he stated, the patch material does not increase the life of the surrounding material); (4) painting (because, he stated, this work is typically performed as part of a scheduled maintenance program); and (5) installing stiffeners and other structural steel (because, he stated, this work does not increase the capacity of the bridge). We disagree that these categories of work, as performed by petitioner, are routine maintenance. Mr. Gibson visited many of the jobsites of the disputed projects, and he was the individual who was most familiar with the specific work that petitioner performed. He testified persuasively as to the type, extent, and significance of the work that petitioner performed on each project. He testified persuasively that Mr. Ronspies failed to understand the type, extent, and significance of the work that petitioner performed on the projects.[15]

In addition, Mr. Gibson explained that the bridges on which petitioner worked were dilapidated because they had not been properly maintained and that petitioner could not

---

[15] For example, Mr. Ronspies viewed job No. 05–1028 as a simple paint job, and he viewed job No. 06–1089 as isolated asphalt repairs and some new expansion joints. Mr. Ronspies' view was blurred as to both jobs. In the former job, the ODOT paid petitioner approximately $266,000 to remove a perceived hazardous material, to blast a bridge to remove corrosion, and to apply a protective paint coating. In the latter job, the TxDOT paid petitioner approximately $65,000 to rehabilitate the joint and spall of pavement.

simply repair the bridges but had to rehabilitate the bridges significantly. He also explained that petitioner's addition of a protective coating to a bridge is significantly different from and more sophisticated and extensive than the outdated basic type of painting job with which Mr. Ronspies was familiar.[16] Bridges, Mr. Gibson stated, used to be painted with materials that have now been established to be hazardous to the environment and to human health, and the trend in the last decade or two has been to apply a protective coating to a bridge instead of simply painting it. He explained that the protective coating is designed to last approximately 20 or more years without any additional maintenance and that failing to coat can cause beams to rust, thus resulting in the bridge not being usable anymore. His testimony was echoed in many regards by Mr. Smith's testimony.

As respondent would have it, the rehabilitation of one or more components of real property would be a repair unless all of the property's major components were replaced. Such is so, Mr. Ronspies stated, even if the new component was (or components were) superior to the old component(s). We disagree with this view. First, as discussed *supra* pp. 232–234, we do not understand such a principle to apply to repairs in general. Second, petitioner concludes (and we agree) that petitioner's renovation of major components often extended the useful life of the structures as a whole on account of the intricate interaction of all of the components. Petitioner's work on a part of a structure resulted in a more permanent increment in the longevity, utility, and worth of the structure as a whole which, in turn, increased the useful life of the overall structure. See *Smith v. Commissioner*, 300 F.3d at 1033–1034. Third, Messrs. Gibson and Smith opined persuasively that a bridge usually does not deteriorate evenly throughout its life but that certain sections of the bridge deteriorate faster than others on account of their location on the bridge and their exposure to the weather, among other reasons. Fourth, Mr. Smith explained that a repair of infrastructure or other similar real property is typically an

---

[16] Mr. Ronspies worked for a limited time as an overseer of a construction company's painting operations. Those operations were the basic type of painting that Mr. Gibson opined was routine maintenance and was not the contemporary painting that Mr. Gibson stated was a substantial renovation.

expense that the designer anticipated as part of the property's regularly scheduled maintenance program and that such maintenance was not done here. He stated that the lack of normal or routine maintenance and the resulting deterioration of a single component of infrastructure may make the overall infrastructure unusable because it is unsafe. He stated that work such as petitioner's which is aimed specifically at components of infrastructure that have been allowed to deteriorate to a state of disrepair therefore significantly prolongs the useful life of the infrastructure as a whole.

Respondent argues that petitioner cannot prevail because it has not established with any specificity that its work materially increased the value or substantially prolonged the useful life of the disputed property. We disagree. Although the record may not allow us to pinpoint the exact increases in value or useful life on account of petitioner's work, suffice it to say that the record supports petitioner's conclusion that the applicable standards were met for each disputed project. The bid sheets show the scope of petitioner's work and the dollar amounts of its projects, and petitioner's use of the 3-year and 5-percent benchmarks is reasonable in the setting at hand to establish that petitioner's work substantially increased the value, capacity, efficiency, strength, and/or quality of each of the items of real property underlying the disputed projects. [17]

All the same, Mr. Gibson, on behalf of petitioner, analyzed each project and ascertained whether the work on each project materially increased the value of property or substantially prolonged its useful life. (We have included in our description of each project petitioner's conclusion as to whether the project materially increased the value of property and/or substantially prolonged its useful life.) He explained that maintenance projects are anticipated by the designer and included in a regularly scheduled maintenance plan and considered when determining the life of the structure. He explained that regularly scheduled maintenance was lacking as to many of the structures underlying the disputed projects. He explained that the value of a bridge declines from $400,000 to zero over 40 years if it has little or no maintenance, but with $200,000 of rehabilitation work

---

[17] The same is true as to a material increase in useful life.

after 30 years, the value increases from $100,000 to $300,000 and the life of the bridge is extended from 40 years to 60 years. He concluded that petitioner's major rehabilitation work on a bridge increased each bridge's value by the cost of the rehabilitation work and prolonged the bridge's useful life by 20 years. We accept that rationale and understand it to apply with equal strength to petitioner's nonbridge properties as well.

## VIII. *Conclusion*

We conclude that petitioner's projects qualify under section 199 to the extent stated herein.[18] All arguments for a different conclusion have been considered, and those arguments not discussed herein have been rejected as without merit. To take into account the parties' concessions,

*Decision will be entered under Rule 155.*

---

### APPENDIX A

*Casualty Projects*

| Job No. | General type of work | Final contract amount | Revenue earned in subject year | RM | UL | V | DU |
|---|---|---|---|---|---|---|---|
| 05–1021 | Bridge rehabilitation | $640,994 | $347,837 | --- | * | * | --- |
| 05–1023 | Highway sign shoring | 22,114 | 17,114 | --- | * | --- | --- |
| 05–1025 | Bridge rehabilitation | 77,240 | 77,240 | --- | * | * | --- |
| 05–1029 | Bridge rehabilitation | 28,200 | 28,200 | --- | * | * | --- |
| 05–1045 | Bridge rehabilitation | 395,337 | 395,337 | --- | * | * | --- |
| 05–1054 | Bridge rehabilitation | 49,000 | 49,000 | --- | * | * | --- |
| 05–1056 | Bridge rehabilitation | 31,935 | 31,935 | --- | * | * | --- |
| 05–1059 | Bridge rehabilitation | 43,200 | 43,200 | --- | * | * | --- |
| 05–1060 | Highway repair | 398,234 | 398,234 | --- | --- | --- | --- |
| 05–1064 | Bridge rehabilitation | 141,785 | 140,850 | --- | * | * | --- |
| 05–1065 | Bridge rehabilitation | 73,000 | 73,000 | --- | * | * | --- |
| 05–999 | Bridge rehabilitation | 79,668 | 6,000 | --- | * | --- | --- |
| 06–1072 | Bridge rehabilitation | 40,853 | 40,053 | --- | * | * | --- |
| 06–1073 | Bridge rehabilitation | 25,884 | 25,784 | --- | * | * | --- |
| 06–1074 | Bridge rehabilitation | 24,901 | 24,910 | --- | * | --- | --- |
| 06–1078 | Bridge rehabilitation | 24,900 | 24,025 | --- | * | --- | --- |
| 06–1084 | Bridge rehabilitation | 39,830 | 39,830 | --- | * | --- | --- |

---

[18] Our conclusion is consistent with the legislative intent for sec. 199 (e.g., petitioner hired additional employees in years after the subject years) and with 23 U.S.C. sec. 116 (2006) (the Secretary of Transportation presumably concluded that petitioner's projects subject to that title were a cost-effective means of extending the useful lives of Federal-aid highways).

## Casualty Projects

| Job No. | General type of work | Final contract amount | Revenue earned in subject year | RM | UL | V | DU |
|---|---|---|---|---|---|---|---|
| 06–1087 | Bridge rehabilitation | 112,000 | 1,950 | --- | * | --- | --- |
| 06–1091 | Bridge rehabilitation | 11,500 # | 11,500 | --- | * | --- | --- |
| | | | 1,775,999 | | | | |

#:    Project paid for with Federal funds.
RM:   Repair or maintenance.
UL:   Substantially prolonged useful life of real property.
V:    Materially increased value of real property.
DU:   Adapted real property to different or new use.
*:    Category or categories to which petitioner assigned project.

---

# APPENDIX B

## New Construction Projects

| Job No. | General type of work | Final contract amount | Revenue earned in subject year | RM | UL | V | DU |
|---|---|---|---|---|---|---|---|
| 03–906 | Bridge work | $85,014 # | -0- | --- | * | --- | --- |
| 03–921 | Bridge work | 105,646 # | $20,000 | --- | * | --- | --- |
| 03–926 | Bridge work | 62,050 # | -0- | --- | * | --- | |
| 04–937 | Built blast fence | 2,323,112 # | (2,405) | --- | --- | * | * |
| 04–954 | Bridge work | 77,313 # | 500 | --- | * | --- | --- |
| 04–955 | Bridge work | 73,868 # | -0- | --- | * | --- | --- |
| 04–956 | Bridge work | 178,661 # | 159,340 | --- | * | --- | --- |
| 04–959 | Bridge work | 504,241 # | (5,480) | --- | * | --- | --- |
| 04–965 | Highway work | 357,883 # | (1,484) | --- | * | * | * |
| 04–967 | Bridge work | 153,863 # | -0- | --- | * | --- | --- |
| 04–968 | Building work | 112,536 | -0- | --- | * | --- | --- |
| 04–971 | Built airport ramp | 406,322 | -0- | --- | * | * | * |
| 04–981 | Bridge work | 250,166 # | 66,072 | --- | * | --- | --- |
| 04–982 | Bridge work | 483,936 # | 442,948 | --- | * | --- | --- |
| 05–1000 | Bridge work | 41,456 # | 41,456 | --- | * | --- | --- |
| 05–1002 | Bridge work | 140,094 | 1 | --- | * | * | * |
| 05–1003 | Bridge work | 1,391,452 | 1,034,097 | --- | * | --- | --- |
| 05–1011 | Modified handrail | 29,985 | 27,485 | --- | --- | --- | * |
| 05–1018 | Bridge work | 41,992 # | 37,992 | --- | --- | --- | --- |
| 05–1019 | Bridge work | 264,204 | 264,204 | --- | * | --- | --- |
| 05–1028 | Bridge work | 266,800 # | 6,000 | --- | * | * | --- |
| 05–1032 | Bridge work | 11,328 # | 11,328 | --- | --- | --- | --- |
| 05–1036 | Bridge work | 422,372 # | 35,290 | --- | * | * | --- |
| 05–1037 | Bridge work | 178,360 # | 110,825 | --- | * | --- | --- |
| 05–1038 | Bridge work | 169,012 # | 110,700 | --- | * | --- | --- |
| 05–1043 | Highway work | 747,602 # | 25,280 | --- | --- | * | * |
| 05–1047 | Bridge work | 122,000 | 122,000 | --- | * | --- | --- |
| 05–1052 | Airport terminal work | 2,261,192 # | 1,944,968 | --- | * | * | * |
| 05–1057 | Bridge work | 57,100 # | 100 | --- | * | --- | --- |
| 05–995 | Bridge work | 86,606 | 86,606 | --- | * | --- | --- |
| 06–1069 | Built retaining wall | 154,273 | 154,273 | --- | * | * | --- |
| 06–1071 | Bridge work | 64,530 # | 11,000 | --- | * | --- | --- |
| 06–1085 | Culvert work | 45,823 | 45,823 | * | --- | --- | --- |

## New Construction Projects

| Job No. | General type of work | Final contract amount | Revenue earned in subject year | RM | UL | V | DU |
|---|---|---|---|---|---|---|---|
| 06–1089 | Bridge work | 65,592 # | 58,425 | --- | * | --- | --- |
| 06–1093 | Bridge work | 908,143 # | 2,000 | --- | * | --- | --- |
| Misc. | --- | 329,273 | 329,273 | --- | --- | --- | --- |
| | | | 5,138,617 | | | | |

#:  Project paid for with Federal funds.
RM: Repair or maintenance.
UL: Substantially prolonged useful life of real property.
V:  Materially increased value of real property.
DU: Adapted real property to different or new use.
*:  Category or categories to which petitioner assigned project.

---

## APPENDIX C

### Rehabilitation Projects

| Job No. | General type of work | Final contract amount | Revenue earned in subject year | RM | UL | V | DU |
|---|---|---|---|---|---|---|---|
| 02–861 | Airport pavement work | $2,011,996 # | -0- | --- | * | --- | --- |
| 03–874 | Bridge work | 356,500 # | -0- | --- | * | --- | --- |
| 03–890 | Bridge work | 159,722 # | $21,810 | --- | * | --- | --- |
| 03–902 | Bridge work | 291,789 # | (1,885) | --- | * | --- | --- |
| 03–915 | Bridge work | 653,395 # | 18,000 | --- | * | --- | --- |
| 04–950 | Bridge work | 2,481,935 # | 79,520 | --- | * | * | * |
| 04–951 | Bridge work | 179,000 # | -0- | --- | * | * | --- |
| 04–958 | Bridge work | 620,622 # | -0- | --- | * | * | --- |
| 04–960 | Bridge work | 47,870 | -0- | --- | * | --- | * |
| 04–961 | Bridge work | 173,378 | 2,260 | --- | * | --- | * |
| 04–969 | Bridge work | 48,086 # | 297 | --- | * | --- | --- |
| 04–970 | Bridge work | 534,083 # | 140,659 | --- | * | --- | --- |
| 04–983 | Bridge work | 3,990 | -0- | --- | * | --- | --- |
| 04–985 | Bridge work | 535,148 # | 65,259 | --- | * | * | --- |
| 04–986 | Bridge work | 161,819 | -0- | --- | * | --- | * |
| 04–987 | Bridge work | 19,981 # | 11 | --- | * | --- | --- |
| 05–1004 | Bridge work | 145,174 # | 7,713 | --- | * | * | --- |
| 05–1006 | Pavement work | 719,924 | 540,103 | --- | * | --- | --- |
| 05–1009 | Traffic barrier wall | 294,863 | 236,185 | --- | * | --- | --- |
| 05–1013 | Bridge work | 18,600 | 18,600 | --- | * | --- | --- |
| 05–1017 | Bridge work | 174,716 | 174,716 | --- | * | --- | --- |
| 05–1020 | Bridge work | 724,352 # | 681,101 | --- | * | --- | --- |
| 05–1022 | Bridge work | 24,868 | 21,368 | --- | * | --- | --- |
| 05–1024 | Bridge work | 167,198 | 167,198 | --- | * | * | --- |
| 05–1033 | Pavement work | 116,815 | 116,815 | --- | * | --- | --- |
| 05–1046 | Bridge work | 294,788 | 294,788 | --- | * | --- | --- |
| 05–1048 | Bridge work | 959,694 # | 97,531 | --- | * | * | --- |
| 05–1049 | Bridge work | 543,670 # | 53,478 | --- | * | --- | --- |
| 05–1050 | Bridge work | 537,943 # | 327,661 | --- | * | * | --- |
| 05–1051 | Bridge work | 256,122 | 256,122 | --- | * | * | --- |
| 05–1061 | Bridge work | 370,929 # | 164,449 | --- | * | --- | --- |
| 05–1062 | Bridge work | 64,649 | 64,649 | --- | * | --- | --- |
| 05–1063 | Bridge work | 1,180,258 | 784,069 | --- | * | --- | --- |
| 05–996 | Work on civic center | 99,901 | 2,336 | --- | * | --- | --- |
| 05–997 | Bridge work | 432,030 | 159,935 | --- | * | * | --- |
| 06–1067 | Bridge work | 37,079 | 37,079 | --- | * | * | --- |
| 06–1068 | Bridge work | 51,179 | 500 | --- | * | --- | --- |
| 06–1070 | Work on grandstand | 23,400 | 23,400 | --- | * | --- | --- |
| 06–1075 | Bridge work | 950,931 # | 163,395 | --- | * | --- | --- |

*Rehabilitation Projects*

| Job No. | General type of work | Final contract amount | Revenue earned in subject year | RM | UL | V | DU |
|---------|---------------------|----------------------|-------------------------------|-----|-----|-----|-----|
| 06–1076 | Bridge work | 89,298 | 89,298 | --- | * | * | --- |
| 06–1079 | Bridge work | 434,498 # | 3,000 | --- | * | --- | --- |
| 06–1080 | Streetscape work | 2,748,957 # | -0- | --- | --- | * | * |
| 06–1081 | Bridge work | 131,147 | 67,269 | --- | * | --- | --- |
| 06–1082 | Bridge work | 123,222 | 122,892 | --- | * | --- | --- |
| 06–1088 | Bridge work | 549,490 # | 3,000 | --- | * | --- | --- |
| 06–1090 | Modified entranceway | 24,971 | 24,971 | --- | * | * | * |
| 06–1094 | Bridge work | 1,102,617 | -0- | --- | * | --- | --- |
| 06–1095 | Highway work | 159,375 | -0- | --- | * | * | * |
| 06–1096 | Bridge work | 321,910 | 1,000 | --- | * | --- | --- |

5,030,552

#:   Project paid for with Federal funds.
RM:  Repair or maintenance.
UL:  Substantially prolonged useful life of real property.
V:   Materially increased value of real property.
DU:  Adapted real property to different or new use.
*:   Category or categories to which petitioner assigned project.

---

APPENDIX D

SEC. 199. INCOME ATTRIBUTABLE TO DOMESTIC PRODUCTION ACTIVITIES.

(a) ALLOWANCE OF DEDUCTION.—

(1) IN GENERAL.—There shall be allowed as a deduction an amount equal to 9 percent of the lesser of—

(A) the qualified production activities income of the taxpayer for the taxable year, or

(B) taxable income (determined without regard to this section) for the taxable year.

(2) PHASEIN.—In the case of any taxable year beginning after 2004 and before 2010, paragraph (1) shall be applied by substituting for the percentage contained therein the transition percentage determined under the following table:

| For taxable years beginning in: | The transition percentage is: |
|---------------------------------|-------------------------------|
| 2005 or 2006 ........................................... | 3 |
| 2007, 2008, or 2009 ................................ | 6 |

(b) DEDUCTION LIMITED TO WAGES PAID.—

(1) IN GENERAL.—The amount of the deduction allowable under subsection (a) for any taxable year shall not exceed 50 percent of the W–2 wages of the taxpayer for the taxable year.

*     *     *     *     *     *     *

(c) QUALIFIED PRODUCTION ACTIVITIES INCOME.—For purposes of this section—

(1) IN GENERAL.—The term "qualified production activities income" for any taxable year means an amount equal to the excess (if any) of—

(A) the taxpayer's domestic production gross receipts for such taxable year, over

(B) the sum of—

(i) the cost of goods sold that are allocable to such receipts, and

(ii) other expenses, losses, or deductions (other than the deduction allowed under this section), which are properly allocable to such receipts.

\* \* \* \* \* \* \*

(4) DOMESTIC PRODUCTION GROSS RECEIPTS.—

(A) IN GENERAL.—The term "domestic production gross receipts" means the gross receipts of the taxpayer which are derived from—

\* \* \* \* \* \* \*

(ii) in the case of a taxpayer engaged in the active conduct of a construction trade or business, construction of real property performed in the United States by the taxpayer in the ordinary course of such trade or business \* \* \*